GRAHAM v. GUNN.

(*Nashville.*    March 12, 1889.)

1. LAND LAW.    *Grant of land lying in two counties valid.*

Grant of land, lying "north and east of Congressional Reservation Line," issued in 1840,[*] upon entry for 5,000 acres made under Act 1829, Ch. 85, and having its beginning corner in one county, but including lands lying in another county, is valid as to lands situated in both counties, although both entry and grant purport to be for lands lying wholly in the former county.

Acts cited and construed : Acts 1823, Ch. 49; Acts 1825, Ch. 28; Acts 1827, Ch. 46; Acts 1829, Ch. 85; *Id.*, Ch. 87. (See Vol. 2 of Haywood's & Cobbs' Statutes of Tennessee, pp. 118, 121, 123, 124.)

2. SAME.    *Same.    Recording copy of survey in other county.*

Such grant is not void as to lands lying in a county other than that in which the beginning corner of entry was located, by reason of the failure to record a copy of the survey of the entry in the entry taker's office of the "other county," as required by Acts 1825, Ch. 28, and 1827, Ch. 46.

This requirement of said Acts, even if essential to validity of the grant, had been, prior to 1840, abolished by Act 1829, Ch. 87, which substituted in lieu thereof the requirement "that the entry and survey shall not interfere with any other prior legal claim."

*We are not aware of any change, since 1840, in the law touching entries and grants of land lying in two counties. The "Congressional Reservation Line" was established by Act of Congress of 1806. Its calls are : "Beginning at the place where the eastern or main branch of Elk River shall intersect the boundary line of the State of Tennessee, from thence running due north until said line shall intersect the northern or main branch of Duck River; thence down the waters of Duck to the military boundary line, as established by the seventh section of an Act of the State of North Carolina, entitled, "An Act for the relief of the officers, 'etc.' (passed in the year 1783); thence with the military boundary line west, to the place where it intersects the Tennessee River; thence down the waters of the river Tennessee to the place where the same intersects the northern boundary line of the State of Tennessee." (Haywood & Cobb, Vol. 2, pp. 13, 14.)—REPORTER.

Acts cited and construed: Acts 1825, Ch. 28; Acts 1827, Ch. 46; Acts 1829, Ch. 87.

Case cited and distinguished: Crutchfield *v.* Hammock, 4 Hum., 204.

3. STATUTES. *Construction.* *In pari materia.*

Statutes *in pari materia* are to be construed together as one system. This case affords a striking illustration of this rule.

FROM DICKSON.

Appeal from Chancery Court of Dickson County. G. H. NIXON, Ch.

LEECH & LEECH and T. C. MORRIS for complainant.

H. M. McADOO and T. J. FREEMAN for defendant.

LURTON, J. This is a bill to stay waste. The title of complainant is deraigned from a grant issuing in 1853. The title of defendants, by regular chain of conveyances, is traced back to a grant to J. C. King in 1840. There has been no such possession by either party as makes a title under the statute of limitations. The title of defendant is the superior one, unless the grant under which he holds is void, and this presents the question to be decided.

The King grant issued upon an entry made in

an entry taker's office for Humphreys County in 1839, and both entry and grant purport to be for land lying in Humphreys County. A survey, however, shows that while the beginning corner, and a large part of the entry lie in Humphreys County, yet a part of the land entered and granted, *embracing that now in dispute*, laps over into the adjoining county of Dickson.

The contention of complaint is that the King grant is void as to so much of the land within its bounds as lies within the county of Dickson. The land in controversy lies north and east of the congressional reservation line, and north of the Tennessee River.

The Act of 1823, Ch. 49, which provides for the entering of the vacant lands lying in that district, provided for the election and qualification of one entry taker for each county in the district, and while the officer receiving the entry is not by that Act expressly prohibited from receiving an entry for lands which lie partly out of the county for which he is elected, yet it is argued that the authority and power of each entry taker is, by necessary implication, limited to the reception of entries for land wholly lying within his own county. The grant under which defendants claim purports to have issued under the Act of January 9, 1830, being Chapter 85. By Chapter 87 of the Acts of 1829, being an Act passed January 9, 1830, and the same day of the passage of the Act under which the King grant purports to have been issued,

it was provided, " That where an entry has been
heretofore made, or may hereafter be made, in any
county in this State, under the law of 1823 and
1825, authorizing land to be entered at twelve and
a half cents and one cent per acre, north and east
of the congressional reservation line, and north of
the Tennessee River, the beginning corner of which
is in one county and a part of the entry in
another, that it shall and may be lawful for the
surveyor of the county where such beginning corner
is situated to proceed and survey such entry agree-
able to the calls, *provided* such entry and survey
shall not interfere with any other prior legal claim."

The Acts of 1823 and 1825, referred to in this
Act last cited, were Acts authorizing the entry of
lands in the district embracing, among other coun-
ties, the two counties of Dickson and Humphreys.
The Act of 1823 fixed the price to be paid by the
enterer at twelve and a half cents per acre, and
limited the quantity to be covered by one entry to
six hundred and forty acres.

The Act of 1825 reduced the price from twelve
and a half cents to one cent per acre. By the
Act of 1827, Ch. 46, the quantity which might be
embraced by one entry of lands in the district
north and east of the congressional reservation line
was increased to one thousand acres. By the Act
of January 9, 1830, being the Act under which
the King grant purports to have been entered, the
quantity which might lawfully be included in one
entry was increased to five thousand acres, and the

provision in former acts requiring the enterer to
pay one cent per acre was repealed, and the fees
of the entry taker for taking an entry were reduced.
These four acts all relate to one subject, and hence,
are to be construed as parts of one whole. The
Act of January 9, 1830, is obviously but an amend-
ment of the Acts of 1823 and 1825 concerning the
entering and granting of the vacant lands in this
district. Now the Act authorizing the survey of
lands where the beginning corner lay in one county
and a part of the entry in another, refers not only
to entries which *had* been made under the Acts of
1823 and 1825, but it was to operate prospectively
upon entries *thereafter* to be made. The Act of
1830 is but an amendment of the Acts of 1823 and
1825, and we are of opinion that the Act passed
upon the same day, which authorized the survey
of entries beginning in one county and extending
into another, applies to entries made under and by
virtue of the Act of 1830.

The next objection urged to the validity of the
King grant is based upon the provisions of the Act
of 1825, Chapter 28, which is as follows: "That
where an entry has been heretofore made in any
county in this State, under the law of 1823, author-
izing land to be entered north and east of the
congressional reservation line, the beginning corner
of which is in one county, and a part of the entry
in another, it shall and may be lawful for the sur-
veyor of the county where such beginning corner
is situated, to proceed and survey such entry as in

other cases, and a copy thereof shall be taken by the enterer to the entry taker's office of the other county, as the case may be, and be recorded therein, for which service of recording the entry taker shall be allowed one dollar." This Act related exclusively to entries theretofore made, and it had no prospective effect. But by the Act of 1827, Ch. 46, its provisions were extended to all entries thereafter made of lands north and east of the congressional reservation line. The entry upon which the King grant is based is not shown to have been recorded as provided by these Acts, and it is insisted that for this reason the grant is void as to the land embraced within its bounds which lies in Dickson County.

The Acts of 1829, Ch. 87, heretofore cited, does not contain any provision requiring the recording of the entry in the county into which the entry extends. The only limitation upon the latter Act is that "such entry and survey shall not interfere with any other prior legal claim." In all other respects the Act of 1830 is identical with the Act of 1825. The omission of the requirement that the enterer should record his entry in the "other county," is significant, and when we consider that in lieu of it is the proviso that such entry shall not interfere with a prior entry, we can but regard the latter Act as entirely substituted for the former, thereby abolishing the requirment as to recording such entries. But independently of this view we should be slow to hold that the mere failure of the en-

terer to record such an entry in the other county, into which his entry extended, should have the effect of rendering the grant void. The Act relied upon does not, in terms, declare the entry void for failure to record it. The entry taker clearly had authority to receive the entry, and the surveyor to survey it. Neither the entry taker nor the surveyor were required to cause it to be recorded. The enterer was required to record it, but this was after the entry had been made and surveyed. To hold that a grant is void for failure of the enterer to so record his entry, would be going further in avoiding a grant on a collateral attack than any reported case has gone. The case of *Crutchfield* v. *Hammock*, 4 Hum., 204, is not like this case. In that case the entry taker had no power to receive the entry, and the principle is laid down that entries and grants are void, and may be resisted in any suit, where there is a want of property in the grantor, or want of power in the officers to receive the entry or issue the grant. Then there was no want of property in the grantor, or power in the officer, to secure the entry or issue the grant. The contrary conclusion as to the validity of this grant would, it is believed, result in incalculable injury and litigation. The lands of the State have probably all been long since granted, and now, after the Act of 1830 has been in force more than half a century, to hold a grant void because a part of the granted land lay in a county other than that in which the beginning corner of the entry is found,

would probably disturb a vast number of very old titles. Every consideration of public policy forbids such a construction unless the plain letter of the law permits none other. We are of opinion that the King grant is valid, and the decree of the Chancellor must be reversed, and the bill of complainant dismissed with costs.